[Cite as *State v. Hardesty*, 2020-Ohio-246.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. William B. Hoffman, P.J |
| Plaintiff-Appellee | Hon. W. Scott Gwin, J.<br>Hon. John W. Wise, J. |
| -vs- | Case No. 2018CA00178 |
| RICHARD HARDESTY | |
| Defendant-Appellant | O P I N IO N |

CHARACTER OF PROCEEDINGS:     Appeal from the Stark County Court of
Common Pleas, Case No. 2017CR2320

JUDGMENT:     Affirmed

DATE OF JUDGMENT ENTRY:     January 27, 2020

APPEARANCES:

For Plaintiff-Appellee

JOHN D. FERRERO
Prosecuting Attorney
Stark County, Ohio

KRISTINE W. BEARD
Assistant Prosecuting Attorney
Appellate Section
110 Central Plaza, South, Ste. #510
Canton, Ohio  44702-1413

For Defendant-Appellant

D. COLEMAN BOND
116 Cleveland Avenue, N.W.
600 Courtyard Centre
Canton, Ohio  44702

*Hoffman, P.J.*

{¶1} Appellant Richard Hardesty appeals the judgment entered by the Stark County Common Pleas Court convicting him following his pleas of no contest to four counts aggravated vehicular homicide, two counts aggravated vehicular assault, two counts vehicular assault, operating a vehicle under the influence of alcohol, driving under suspension, and driving under OVI suspension, and sentencing him to an aggregate term of incarceration of sixteen years. Appellee is the state of Ohio

STATEMENT OF THE FACTS AND CASE

{¶2} At approximately 10:15 p.m. on November 17, 2017, Officer Mike Manos of the Massillon Police Department was dispatched to the scene of a serious automobile accident on State Route 21 at Walnut Road SW, in the city of Massillon. Appellant was identified as the operator of a Jeep Wrangler which caused the rear-end collision, resulting in the death of one person and serious injuries to two other individuals. According to witnesses at the scene, Appellant rammed into stopped vehicles at a high rate of speed without applying his brakes. Officer Manos did not observe skid marks or note any other evidence Appellant took evasive action prior to slamming into the vehicle in front of him.

{¶3} Officer Manos spoke to Appellant while Appellant remained in his vehicle. The officer noted Appellant's eyes were glassy and bloodshot, but did not initially smell alcohol. However, Appellant's airbag had deployed producing a chemical smell, in addition to the other chemical odors from the crash itself, and the officer had been ill. The officer felt Appellant could be driving while impaired due to the condition of Appellant's eyes, the severity of the crash, and Appellant's failure to apply his brakes to try to avoid the collision.

{¶4}    Officer Manos intended to administer three field sobriety tests:   the horizontal gaze nystagmus test, the one-leg stand test, and the walk and turn test.  During the testing, Officer Miguel Riccio joined Officer Manos.  Officer Riccio noted a strong odor of alcohol about Appellant.  When Officer Riccio asked Appellant if he had anything to drink, Appellant responded he had one beer.

{¶5}    After administering the horizontal gaze nystagmus test, Officer Manos indicated Appellant demonstrated all clues of impairment in both the right and left eyes.  When the officer attempted to administer the one-leg stand test, Appellant was only able to lift his leg a few inches and could not hold the position longer than a second.  Appellant further was unable to count as requested during the test.  Appellant was unable to follow the instructions for the walk and turn test, and started walking before instructed to begin the test.

{¶6}    Appellant was transported to the hospital by ambulance, where he was met by Officers Manos and Riccio.  Officer Manos read the BMV Implied Consent Form 2255 to Appellant before requesting a blood and urine test.  Appellant acknowledged he understood, and he signed the consent form.  However, the original consent form was misplaced, and Officer Manos had only photocopied the front of the form.

{¶7}    Appellant's blood was collected for testing by a hospital employee, and the officers personally observed Appellant provide a urine sample in the collection cup provided.

{¶8}    Appellant was indicted by the Stark County Grand Jury on the eleven counts noted, supra.  He filed a motion to suppress, including arguments he was questioned in violation of Miranda; the officers failed to conduct field sobriety tests in substantial

compliance with the National Highway Traffic Safety Administration (NHTSA) standards; he did not voluntarily consent to providing blood and urine samples, and the doctrine of implied consent is inapplicable because he was not under arrest at the time of testing; and his blood and urine samples were not collected, tested and stored in substantial compliance with the Ohio Administrative Code.

{¶9}   Following evidentiary hearings conducted over several days, the trial court suppressed the results of the horizontal gaze nystagmus test.  The trial court overruled the remainder of Appellant's motion to suppress.

{¶10} Appellant changed his plea to no contest to all eleven counts of the indictment, and was convicted and sentenced to an aggregate term of incarceration of sixteen years.  It is from the November 30, 2018 judgment of conviction and sentence Appellant prosecutes this appeal, assigning as error:


I. THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS ALL OF THE FIELD SOBRIETY TESTS BECAUSE THE STATE FAILED TO SATISFY ITS BURDEN TO SHOW BY CLEAR AND CONVINCING EVIDENCE THAT THE TESTS WERE ADMINISTERED IN SUBSTANTIAL COMPLIANCE WITH THE TESTING STANDARDS FOR ANY RELIABLE, CREDIBLE, AND GENERALLY ACCEPTED FIELD SOBRIETY TESTS THAT WERE IN EFFECT AT THE TIME THE TESTS WERE ADMINISTERED.

II. THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS ALL EVIDENCE STEMMING FROM THE

COLLECTION AND TESTING OF THE APPELLANT'S BLOOD AND URINE FOR PURPOSES OF PROVING A VIOLATION OF R.C. 4511.19 BECAUSE THE STATE FAILED TO SUBSTANTIALLY COMPLY WITH THE PROVISIONS OF THE OHIO ADMINISTRATIVE CODE 3701-53 WHEN COLLECTING AND ANALYZING THE SAMPLES.

III. THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS ALL EVIDENCE STEMMING FROM THE COLLECTION AND TESTING OF THE APPELLANT'S BLOOD AND URINE SAMPLES FOR PURPOSES OF PROVING A VIOLATION OF R.C. 4511.19 BECAUSE THE TESTIMONY PRESENTED BY THE STATE ESTABLISHED THAT THE BLOOD AND URINE SAMPLES THAT WERE TESTED IN THIS MATTER WERE NOT THE BLOOD AND URINE SAMPLES COLLECTED FROM THE APPELLANT.

IV. THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS ALL EVIDENCE STEMMING FROM THE COLLECTION AND TESTING OF THE APPELLANT'S BLOOD AND URINE FOR PURPOSES OF PROVING A VIOLATION OF R.C. 4511.19 BECAUSE THE APPELLANT DID NOT EFFECTIVELY CONSENT TO THE WARRANTLESS SEARCHES AND SEIZURES OF HIS BLOOD AND URINE.

V. THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS ANY AND ALL STATEMENTS MADE BY THE

APPELLANT AS THE LAW ENFORCEMENT OFFICERS VIOLATED THE APPELLANT'S RIGHT TO BE FREE FROM SELF-INCRIMINATION.

VI. THE APPELLANT WAS DENIED THE RIGHT TO EFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN REGARD TO THE FILING OF THE AFFIDAVIT OF DISQUALIFICATION WITH THE OHIO SUPREME COURT.

I.

{¶11} Appellant's first five assignments of error challenge the trial court's ruling on his motion to suppress.

{¶12} There are three methods of challenging on appeal a trial court's ruling on a motion to suppress. First, an appellant may challenge the trial court's findings of fact. In reviewing a challenge of this nature, an appellate court must determine whether said findings of fact are against the manifest weight of the evidence. *State v. Fanning*, 1 Ohio St.3d 19, 437 N.E.2d 583 (1982); *State v. Klein*, 73 Ohio App.3d 486, 597 N.E.2d 1141(1991); *State v. Guysinger*, 86 Ohio App.3d 592, 621 N.E.2d 726(1993). Second, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact. In that case, an appellate court can reverse the trial court for committing an error of law. *State v. Williams*, 86 Ohio App.3d 37, 619 N.E.2d 1141 (1993). Finally, assuming the trial court's findings of fact are not against the manifest weight of the evidence and it has properly identified the law to be applied, an appellant may argue the trial court has incorrectly decided the ultimate or final issue raised in the motion to suppress. When reviewing this type of claim, an appellate court must independently

determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. *State v. Curry*, 95 Ohio App.3d 93, 641 N.E.2d 1172 (1994); *State v. Claytor*, 85 Ohio App.3d 623, 620 N.E.2d 906 (1993); *Guysinger, supra.* As the United States Supreme Court held in *Ornelas v. U.S.*, 517 U.S. 690, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996), "... as a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal."

{¶13} When ruling on a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and to evaluate the credibility of witnesses. *See State v. Dunlap,* 73 Ohio St.3d 308, 314, 1995–Ohio–243, 652 N.E.2d 988; *State v. Fanning* , 1 Ohio St.3d 19, 20, 437 N.E.2d 583 (1982).

{¶14} In his first assignment of error, Appellant argues the trial court erred in failing to suppress the results of the one-leg stand and walk and turn field sobriety tests because the officer did not testify regarding the applicable standards as set forth in the NHTSA manual, and further did not testify he conducted the tests in compliance with the standards set forth in the manual.

{¶15} The instant case provides an unusual scenario in which there were no results of either the one-leg stand test or the walk and turn test due to Appellant's failure to complete the tests past the instructional stage.    Officer Manos's testimony demonstrated he was unable to score either test.  5/14/18 Tr. 113.

{¶16} The Ohio Supreme Court has held even where an officer failed to substantially comply with NHTSA testing standards, the officer may testify as to his observations of the defendant during administration of non-scientific field sobriety tests:

The nonscientific field sobriety tests involve simple exercises, such as walking heel-to-toe in a straight line (walk-and-turn test). The manner in which defendant performs these tests may easily reveal to the average layperson whether the individual is intoxicated. We see no reason to treat an officer's testimony regarding the defendant's performance on a nonscientific field sobriety test any differently from his testimony addressing other indicia of intoxication, such as slurred speech, bloodshot eyes, and odor of alcohol. In all of these cases, the officer is testifying about his perceptions of the witness, and such testimony helps resolve the issue of whether the defendant was driving while intoxicated.

Unlike the actual test results, which may be tainted, the officer's testimony is based upon his or her firsthand observation of the defendant's conduct and appearance. Such testimony is being offered to assist the jury in determining a fact in issue, i.e., whether a defendant was driving while intoxicated. Moreover, defense counsel will have the opportunity to cross-examine the officer to point out any inaccuracies and weaknesses. We conclude that an officer's observations in these circumstances are permissible lay testimony under Evid. R. 701. Therefore, we answer the certified question in the negative and hold that a law enforcement officer may testify at trial regarding observations made during a defendant's performance of nonscientific standardized field sobriety tests.

{¶17}  *State v. Schmitt*, 101 Ohio St.3d 79, 2004-Ohio-37, 801 N.E.2d 446, ¶¶ 14-15 (2004).

{¶18}  In the instant case, there were no results of the tests to suppress, but only testimony of the officer's observations of Appellant during the attempted tests.  Therefore, even if the State failed to demonstrate the tests were administered in accordance with NHTSA standards, the officer's testimony concerning his observations of Appellant during his attempted administration of the one-leg stand and walk and turn tests would have been admissible.  Accordingly, even if the trial court erred in finding substantial compliance with NHTSA testing standards, any error is harmless, as the only testimony available to the State concerning these tests was not results of the testing, but the officer's admissible observations.

{¶19}  The first assignment of error is overruled.

II.

{¶20}  In his second assignment of error, Appellant argues the court erred in overruling his motion to suppress his blood and urine test results because the evidence did not demonstrate the State substantially complied with the sealing and labeling requirements set forth in OAC 3701-53-05, failed to demonstrate the blood sample was collected in accordance with hospital protocol as set forth in the laboratory procedure manual, and failed to demonstrate the person who tested the blood and urine was qualified in accordance with OAC 3701-53-07.  He further argues the State was required to demonstrate strict compliance with OAC collection and labeling procedures because the State failed to demonstrate the blood and urine samples tested in the instant case

were the samples actually collected from him, based on a discrepancy in the testimony regarding the external packaging of the samples.

**{¶21}** When results of blood-alcohol tests are challenged in an aggravated vehicular homicide prosecution which depends upon proof of an R.C. 4511.19(A) violation, the state must show substantial compliance with R.C. 4511.19(D)(1) and Ohio Adm. Code Chapter 3701–53 before the test results are admissible. *State v. Mayl*, 106 Ohio St.3d 207, 2005-Ohio-4629, 833 N.E.2d 1216, ¶ 48 (2005).

**{¶22}** Ohio Administrative Code (OAC) Section 3701-53-05 sets for the standards for collecting a legal blood or urine sample:

(A) All samples shall be collected in accordance with section 4511.19, or section 1547.11 of the Revised Code, as applicable.

(B) When collecting a blood sample, an aqueous solution of a non-volatile antiseptic shall be used on the skin. No alcohols shall be used as a skin antiseptic.

(C) Blood shall be drawn with a sterile dry needle into a vacuum container with a solid anticoagulant, or according to the laboratory protocol as written in the laboratory procedure manual based on the type of specimen being tested.

(D) The collection of a urine specimen must be witnessed to assure that the sample can be authenticated. Urine shall be deposited into a clean glass or plastic screw top container which shall be capped, or collected

according to the laboratory protocol as written in the laboratory procedure manual.

(E) Blood and urine containers shall be sealed in a manner such that tampering can be detected and have a label which contains at least the following information:

(1) Name of suspect;

(2) Date and time of collection;

(3) Name or initials of person collecting the sample; and

(4) Name or initials of person sealing the sample.

(F) While not in transit or under examination, all blood and urine specimens shall be refrigerated.

{¶23} If the State meets its burden of going forward with evidence demonstrating substantial compliance, a presumption of admissibility arises, and the burden shifts to the defendant to rebut the presumption by demonstrating prejudice from the State's failure to strictly comply with the applicable regulations in the Ohio Administrative Code. *State v. Baker*, 146 Ohio St.3d 456, 2016-Ohio-451, 58 N.E.3d 1114, ¶ 23 (2016).

{¶24} Appellant first argues the State failed to demonstrate substantial compliance with the laboratory manual of Affinity Hospital, the hospital at which the blood sample was drawn. We note the rule requires the sample to be drawn according to laboratory protocol as written in the procedure manual, *or* the blood to be drawn with a sterile dry needle into a vacuum container with a solid anticoagulant.

**{¶25}** In the instant case, Dannielle Shavers, a certified phlebotomist at Affinity Medical Center, testified she used a blood kit provided by the police officers, which included a gray capped vacutainer tube. She testified she sterilized Appellant's skin with betadine, and used a dry sterile needled provided by the hospital to draw the blood into the vacutainer tube provided by police. 4/2/18 Tr. 19, 37, 39. Jennifer Creed, a criminalist in the drug chemistry section of the Stark County Crime Lab, testified the crime lab provides the Massillon Police Department with the blood draw kits, including the vacutainer tube with a gray cap. The gray cap identifies the tube as containing solid anticoagulants. 4/17/18 Tr. 122-125. Because the State presented evidence the blood was drawn with a sterile dry needle into a vacuum container with a solid anticoagulant, the State was not required to prove compliance with laboratory protocol. We find the testimony demonstrated substantial compliance with OAC 3701-53-05(C).

**{¶26}** Appellant next argues the evidence failed to demonstrate the blood and urine samples were sealed and labeled in compliance with OAC 3701-53-05(E).

**{¶27}** Danielle Shavers testified the vacutainer she used to collect Appellant's blood immediately seals itself when removed from the needle. She testified she removed the tube from the needle and handed the sample to one of the police officers present in the room. She then used the same needle to draw a medical blood sample for hospital use. After she drew the medical sample, she used a preprinted label including Appellant's name, date of birth, and date of the procedure to identify the first legal sample. She then wrote the time of collection and her name, attached the label to the tube, placed the tube in a biohazard bag, and handed the sample to the officers. 4/2/18 Tr. 37, 51, 80, 111.

We find Ms. Shavers testimony sufficient to demonstrate substantial compliance with OAC 3701-53-05(E) as to the sealing and labeling of the blood sample.

**{¶28}** With regard to the urine sample, Officer Manos testified he provided Appellant with a standard sterile urine collection cup. Although they looked away to provide Appellant some privacy, the officers were present in the room with Appellant and able to hear the urine hitting the cup. Officer Manos then capped the urine specimen and sealed the cup with evidence tape which was labeled with Appellant's name, date, time of collection and the officer's initials. 4/2/18 Tr. 83-84, 123-128. We find this testimony sufficient to demonstrate substantial compliance with OAC 3701-53-05(E) as to the sealing and labeling of the urine sample.

**{¶29}** Appellant next argues the State failed to demonstrate Jennifer Creed, the criminalist who tested the samples at the Stark County Crime Lab, had the credentials required by OAC 3701-53-07:

(A) Blood, urine, and other bodily substance tests for alcohol shall be performed in a laboratory by an individual who has a laboratory director's permit or, under his or her general direction, by an individual who has a laboratory technician's permit. General direction does not mean that the laboratory director must be physically present during the performance of the test. Laboratory personnel shall not perform a technique or method of analysis that is not listed on the laboratory director's permit.

(1) An individual who is employed by a laboratory, which has successfully completed a proficiency examination administered by a

national program for proficiency testing for the approved technique or method of analysis for which the permit is sought and who possesses at least two academic years of college chemistry and at least two years of experience in a clinical or chemical laboratory and possesses a minimum of a bachelor's degree shall meet the qualifications for a laboratory director's permit.

(2) An individual who is employed by a laboratory, which has successfully completed a proficiency examination administered by a national program for proficiency testing for the approved technique or method of analysis for which the permit is sought, has been certified by the designated laboratory director that he or she is competent to perform all procedures contained in the laboratory's procedure manual for testing specimens and meets one of the following requirements shall meet the qualifications for a laboratory technician's permit:

(a) Has a bachelor's degree in laboratory sciences from an accredited institution and has six months experience in laboratory testing;

(b) Has an associate's degree in laboratory sciences from an accredited institution or has completed sixty semester hours of academic credit including six semester hours of chemistry and one year experience in laboratory testing;

(c) Is a high school graduate or equivalent and has successfully completed an official military laboratory procedures course of at least fifty

weeks duration and has held the military enlisted occupational specialty of medical laboratory specialist (laboratory technician); or

(d) Is a high school graduate or equivalent and was permitted on or before July 7, 1997.

**{¶30}** State's Exhibit 10, which was identified and used during the testimony of Ms. Creed during the suppression hearing and attached to the State's response to Appellant's motion to suppress, includes a summary of expert witness qualifications. The summary states Ms. Creed has worked as a forensic scientist at the crime lab since 1996. She has held a permit from the Ohio Department of Health for gas chromatography method of alcohol analysis since 2016, and was awarded a Bachelor of Science degree in forensic science by Michigan State University. We find the record reflects Ms. Creed was qualified to perform the requested alcohol analysis of Appellant's blood and urine.

**{¶31}** Finally, Appellant argues because the State failed to demonstrate a chain of custody sufficient to demonstrate the blood and urine tested by Ms. Creed was the same blood and urine collected from Appellant on November 17, 2017, and the testimony demonstrated a discrepancy in the external packaging, the State was required to prove strict compliance with the Ohio Administrative Code.

**{¶32}** Jennifer Creed reviewed and identified her lab report, which documented the labels used to seal and/or to identify the samples contained in the blood tube and the urine cup submitted to her for testing. She testified the label reflected the urine sample was collected by Patrolman Manos, and the blood sample was collected by Danielle Shaver. 4/17/18 Tr. 118. She testified the samples were sealed when she received them.

4/17/18 Tr. 120. Ms. Creed's lab report reflects the sealed urine sample and sealed blood collection kit were labeled with Appellant's name. State's Exhibit 10.

**{¶33}** The State bears the burden of establishing the proper chain of custody; however, it is not an absolute duty. *State v. Moore*, 47 Ohio App.2d 181, 183, 1 O.O.3d 267, 268, 353 N.E.2d 866, 870 (1973). In order to meet its burden, the State need only prove that it is "reasonably certain that substitutions, alteration or tampering did not occur." *Id*. Moreover, a chain of custody may be established by direct testimony or by inference. *State v. Conley*, 32 Ohio App.2d 54, 60, 61 O.O.2d 50, 54, 288 N.E.2d 296, (1971). Officer Manos testified he transported the samples to the evidence locker on November 17, 2017, where he filled out paperwork logging in his information. He testified the samples were in separate Ziploc bags. Officer Baumgardner of the Massillon Police Department testified he examined the samples on Monday, November 20, 2017, and logged them into the system at 7:12 a.m. He testified the samples appeared to be sealed. However, Officer Baumgardner testified one sample was in a clear plastic bag and the other sample in a 6 x 6 manila envelope.

**{¶34}** Shelly Showers of the Stark County Crime Lab testified she received the samples on November 20, 2017, checked to make sure they were sealed, and had Officer Baumgardner sign the appropriate paperwork. She placed the samples in the crime lab refrigerator.

**{¶35}** Jennifer Creed testified she removed the samples for analysis from the crime lab refrigerator. She testified the samples were sealed, and testified the labels contained the date of collection and person collecting the samples in accordance with the prior testimony of Ms. Shaver and Officer Manos.

**{¶36}** We find the testimony sufficient to meet the State's burden to prove it was reasonably certain substitutions, alteration, or tampering did not occur.     Any discrepancies in the description of the external packaging of the sealed and labeled samples are insufficient to demonstrate prejudice which would require the State to demonstrate strict compliance with the Ohio Administrative Code.

**{¶37}** The second assignment of error is overruled.

III.

**{¶38}** In his third assignment of error, Appellant argues the court erred in failing to suppress the results of the blood and urine samples because the State failed to prove a proper chain of custody, and the testimony regarding a discrepancy in the external packaging of the samples demonstrates the samples testified at the crime lab were not the samples taken from Appellant.

**{¶39}** The State bears the burden of establishing the proper chain of custody; however, it is not an absolute duty. *State v. Moore*, 47 Ohio App.2d 181, 183, 1 O.O.3d 267, 268, 353 N.E.2d 866, 870 (1973). In order to meet its burden, the State need only prove that it is "reasonably certain that substitutions, alteration or tampering did not occur." *Id*. Moreover, a chain of custody may be established by direct testimony or by inference. *State v. Conley*, 32 Ohio App.2d 54, 60, 61 O.O.2d 50, 54, 288 N.E.2d 296, (1971). Any break in the chain of custody goes to the credibility, or weight of the evidence, and not to admissibility. *State v. Bazler*, 5th Dist. Licking No. 18-CA-29, 2018-Ohio-5306, ¶ 11.

**{¶40}** As discussed in the second assignment of error above, the State demonstrated a sufficient chain of custody to prove with reasonable certainty

substitutions, alteration, or tampering did not occur. Any discrepancy in testimony regarding whether the urine sample was in a Ziploc bag or a manila envelope went to the credibility or weight of the evidence, and not to its admissibility.

**{¶41}** The third assignment of error is overruled.

IV.

**{¶42}** In his fourth assignment of error, Appellant argues the court erred in failing to suppress the results of his blood and urine tests because his consent was invalid. He argues the implied consent law did not apply because Officer Manos testified he did not obtain consent under the implied consent law, but rather by asking Appellant for consent, which Appellant was unable to voluntarily give due to his medical condition at the time. In the alternative, he argues Officer Manos did not obtain valid consent under the implied consent law because the original BMV Form 2255 signed by Appellant had been lost, and the officer could not specifically remember what he told Appellant regarding Appellant's rights prior to obtaining consent.

**{¶43}** The Ohio Legislature has adopted a statutory scheme whereby anyone who operates a motor vehicle on a public roadway is presumed to have given consent to chemical testing pursuant to R.C. 4511.191(A)(2):

> Any person who operates a vehicle, streetcar, or trackless trolley upon a highway or any public or private property used by the public for vehicular travel or parking within this state or who is in physical control of a vehicle, streetcar, or trackless trolley shall be deemed to have given consent to a chemical test or tests of the person's whole blood, blood serum

or plasma, breath, or urine to determine the alcohol, drug of abuse, controlled substance, metabolite of a controlled substance, or combination content of the person's whole blood, blood serum or plasma, breath, or urine if arrested for a violation of division (A) or (B) of section 4511.19 of the Revised Code, section 4511.194 of the Revised Code or a substantially equivalent municipal ordinance, or a municipal OVI ordinance.

**{¶44}** An arrest occurs when four elements are present: (1) an intent to arrest, (2) under real or pretended authority, (3) accompanied by actual or constructive seizure or detention of the person, and (4) which is so understood by the person arrested. *State v. Darrah*, 64 Ohio St.2d 22, 26, 18 O.O.3d 193, 195, 412 N.E.2d 1328, 1330–1331 (1980).

**{¶45}** The trial court made the following findings concerning whether Appellant was under arrest at the time he consented to the blood and urine testing:

Officer Manos testified that based on his observations at the scene, he made the decision to arrest Defendant for OVI. After administering the field sobriety tests, the officer handcuffed Defendant and placed him in the cruiser. The officer's original intent was to transport Defendant to the hospital in his cruiser. After consulting with others on the scene it was decided to transport Defendant by ambulance. While Defendant was un-cuffed for medical transport and treatment, two officers followed Defendant to the hospital. The decision to transport Defendant to the hospital was made by law enforcement and not at the request of Defendant. Upon arrival

at the hospital, Officers Riccio and Manos met Defendant in his room. They both testified that they were in full uniform and stationed in Defendant's room and that Defendant was not free to leave. The record is clear that at the time Officer Manos requested the blood and urine tests, Defendant was under arrest.

**{¶46}** Judgment Entry, June 27, 2018, p. 15.

**{¶47}** We agree with the trial court's finding, which is supported by the testimony at the suppression hearing, Appellant was under arrest at the time consent was obtained.

**{¶48}** Appellant argues he was physically unable to give voluntary consent due to injuries sustained in the accident. However, voluntary consent is only relevant in the event Appellant was not under arrest at the time the officers asked for consent to obtain a blood and urine sample. Because we find Appellant was under arrest, the implied consent law applies in the instant case. As discussed by the trial court:

Because Defendant was under arrest for a violation of R.C. 4511.19, Ohio's implied consent law applies. Under Ohio's Implied Consent Law, Defendant's consent it [sic] implied, unless Defendant refuses. "For the purpose of R.C. 4511.191, a refusal to submit to a chemical test of the blood, breath or urine will occur where a person, by his acts, words or general conduct, manifests an unwillingness to submit to the test." *Hoban v. Rice*, 25 Ohio St.2d 111, 111-12, 267 N.E.2d 311, 312, (1971). The statue goes so far as to say that in the event that a defendant is dead or

unconscious he is deemed to consent. Defendant expressed no intent to refuse the officer's request for the blood and urine samples. He verbally consented to both. He was calm and compliant when the phlebotomist drew his blood. While the phlebotomist may not have clearly told Defendant she was drawing the blood for law enforcement purposes, the officer had just asked him for a blood sample and Defendant was present in the room when the officer told the phlebotomist that Defendant had consented to a sample and provided the phlebotomist with a blood draw kit containing a vial for Defendant's blood collection. With regard to the urine sample, Defendant was handed a cup and urinated into it voluntarily. Had Defendant wished to refuse, there are many ways he could have physically done so, ranging from refusing to urinate to urinating outside of the collection cup. Thus, none of Defendant's actions expressed a manifest intent to refuse the test. Since Defendant did not refuse, he is deemed by law to have consented.

**{¶49}** Judgment Entry, June 27, 2018, p. 15-16.

**{¶50}** Finally, Appellant argues the State presented insufficient compliance with R.C. 4511.191(C) because the original implied consent form signed by Appellant was lost, the State only had a photocopy of the front of the form, and the officers could not remember precisely what they said to Appellant in informing him of his rights.

**{¶51}** While the failure to inform a defendant of the consequences of refusal to submit to testing may well preclude the suspension of his license pursuant to R.C. 4511.191 and .193, there is no provision in R.C. 4511.19 which requires compliance with

implied consent procedures as a condition of the admissibility of chemical test results in a DUI prosecution. *City of Mansfield v. Ishikawa*, 5th Dist. Richland No. 95-CA-51, 1996 WL 363772, *1,  Thus, the failure to warn a defendant of the consequences of refusing and/or submitting to chemical testing does not require the exclusion of the chemical test results in the criminal prosecution. *Id.  See, also, Cincinnati v. Ramey*, 1st Dist. Hamilton App. No. C-860748, unreported (June 17, 1987)(error to grant motion to suppress for failure of prosecutor to produce implied consent form used to advise defendant of consequences of refusing to submit to test); *State v. Yost*, 5th Dist. Stark App. No. CA-7662, unreported (May 15, 1989) (fact implied consent form left unread not a constitutional violation invoking the exclusionary rule); *State v. Brewer*, 5th Dist. Ashland App. No. CA-796, unreported (October 28, 1983) (failure to correctly advise defendant of consequences of refusing to submit to breathalyzer test does not create constitutional violation to justify granting of motion to suppress).

**{¶52}** The officers testified Appellant was read the preprinted information on the back of BMV Form 2255.  Therefore, although the officers could not provide the actual original copy of the form signed by Appellant, and the photocopy did not include the back of the form, we find there was evidence from which the court could conclude Appellant was read the information required by Ohio's implied consent law.  Further, even if Appellant was not properly instructed of the consequences of refusal, the exclusionary rule does not require suppression of the blood and urine results obtained in the instant case.

**{¶53}** The fourth assignment of error is overruled.

V.

**{¶54}** In his fifth assignment of error, Appellant argues the court erred in failing to suppress statements made during field sobriety testing because he was not read his rights in accordance with *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**{¶55}** In *Miranda*, the United States Supreme Court held when an individual is taken into custody or otherwise deprived of his freedom in any significant way and is subjected to questioning, he must be warned prior to any questioning he has the right to remain silent, anything he says can be used against him in a court of law, he has the right to the presence of an attorney, and if he cannot afford an attorney one will be appointed for him. *Id.* at 478–479. Unless such warnings are demonstrated by the prosecution at trial, no evidence obtained as a result of the interrogation can be used against the defendant. *Id.* A custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444.

**{¶56}** In *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), the U.S. Supreme Court held roadside questioning of a motorist detained pursuant to a routine traffic stop did not constitute "custodial interrogation" for purposes of the Miranda rule, so pre-arrest statements the motorist made in answer to such questioning were admissible against the motorist. If the motorist "thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*." *Id.* at 440.

**{¶57}** In *Berkemer,* an Ohio State Highway Patrol trooper stopped a vehicle he observed weaving on the highway. The trooper asked the driver to exit the vehicle. When the driver had difficulty standing, the trooper asked him to perform a field sobriety test, which he failed. When asked whether he had been using intoxicants, the driver responded he consumed beer and smoked marijuana. The United States Supreme Court concluded during the roadside questioning, the driver of the vehicle had not been taken into custody for purposes of *Miranda. Id.* at 441-42.

**{¶58}** In the instant case, at the time Appellant made the statement to Officer Riccio he had consumed one beer, we find he had not been taken into custody. The encounter occurred at the scene of the accident, and the officers were still attempting to discern what exactly happened. Appellant was not placed in handcuffs and was not placed in the cruiser at this point in time. The officers were still attempting to determine if Appellant was driving impaired when he caused the crash. Because the questioning of Appellant at the scene of the accident was not a custodial interrogation, Miranda warnings were not required, and we find the trial court did not err in overruling Appellant's motion to suppress statements made at the scene.

**{¶59}** The fifth assignment of error is overruled.

VI.

**{¶60}** In his sixth assignment of error, Appellant argues counsel was ineffective in failing to file an affidavit with extrinsic evidence of prejudice in his motion to disqualify the trial court judge in the instant case.

**{¶61}** A properly licensed attorney is presumed competent. *State v. Hamblin*, 37 Ohio St.3d 153, 524 N.E.2d 476 (1988). Therefore, in order to prevail on a claim of

ineffective assistance of counsel, Appellant must show counsel's performance fell below an objective standard of reasonable representation and but for counsel's error, the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674(1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). In other words, appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.*

{¶62} On July 27, 2018, counsel for Appellant filed an affidavit of disqualification of the trial judge in the instant case. Counsel claimed the trial judge was biased against Appellant based on information he received ex parte from the prosecutor's office before the initial pretrial conference, criticized the trial court's participation in plea negotiations, and claimed the judge was personally hostile toward defense counsel.

{¶63} The Ohio Supreme Court denied Appellant's affidavit for disqualification on August 8, 2018. The court first found the affidavit untimely, as it was based on events occurring in January, 2018, yet not filed until late July. The court found further even if the affidavit was timely filed, it did not set forth sufficient grounds for disqualification. Relevant to this assignment of error, the court found counsel failed to support his allegations of hostility and involvement in plea negotiations with transcripts of the proceedings.

{¶64} Appellant has not demonstrated had he provided transcripts in support of his claims, the result of the disqualification proceedings would have been different. Appellant does not point to specific portions of the transcript filed with this Court which demonstrate his claims the trial court was hostile to counsel and/or biased against Appellant, and concedes transcripts were not available to demonstrate his claim the trial

Stark County, Case No. 2018CA00178                                    26

judge was improperly involved in plea negotiations.    Further, Appellant has not demonstrated the Ohio Supreme Court's denial of the affidavit of disqualification affected the outcome of the instant case.

{¶65}  The sixth assignment of error is overruled.

{¶66}  The judgment of the Stark County Common Pleas Court is affirmed.


By: Hoffman, P.J.

Gwin, J.  and

Wise, John, J. concur